IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

LANEY HARRIS                                                                              PLAINTIFF

VS.                                        CASE NO. 4:11-CV-4124

CITY OF TEXARKANA, ARKANSAS;
N. WAYNE SMITH; N. WAYNE SMITH (MAYOR);
LONDELL WILLIAMS; CHAD DOWD;
JAMES MIKE JONES; SUE JOHNSON;
CLINTON S. THOMAS; RICHARD V. HALL JR.;
and ELIZABETH J. HICKS                                      DEFENDANTS

### MEMORANDUM OPINION

Plaintiff Laney Harris brings this action against Defendants the City of Texarkana; N. Wayne Smith; Londell Williams; Chad Dowd; Mike Jones; Sue Johnson; Clinton S. Thomas; Richard V. Hall, Jr.; and Elizabeth J. Hicks.[1] This suit arises from the drawing of ward boundary lines in the city of Texarkana, Arkansas, following the 2010 census. Specifically, Plaintiff claims that boundary lines drawn for Wards 2 and 3 violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Plaintiff alleges that the lines as drawn dilute the minority voting power of African-American residents within Wards 2 and 3. Plaintiff also claims that alleged irregularities in drawing the boundary lines violate the First and Fourteenth Amendments. Plaintiff is seeking declaratory and injunctive relief.

This matter was tried to the Court without a jury on December 2 and 3, 2014. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper pursuant to 28 U.S.C.

---

[1] Wayne Smith, Londell Williams, Chad Dowd, Mike Jones, and Sue Johnson are current or former members of the City of Texarkana, Arkansas Board of Directors. They are being sued in their individual and official capacities. Clinton Thomas, Richard Hall, Jr., and Elizabeth Hicks are current or former members of the Miller County Election Commission. They are being sued in their official capacities only. (ECF No. 3, ¶ 7 ).

§ 1391. The Court now renders its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. The City of Texarkana, Arkansas, is operated under the city-management form of government. The City of Texarkana consists of six wards, each of which is represented by a single member on the City Board of Directors. Each member is popularly elected from the ward in which he or she serves for a four-year term. The Mayor is elected from the City at-large for a four-year term.

2. The electoral history of Wards 2 and 3 is relevant in this case. Plaintiff Laney Harris is an African-American currently serving as a member of the Texarkana City Board of Directors for Ward 2. Plaintiff was first elected in 1996. Prior to Plaintiff being elected, an African-American held the Ward 2 director position. Plaintiff held his seat until 2004 when he was defeated by an African-American opponent. Plaintiff reclaimed his seat in 2008 and ran unopposed in 2012.

From 1978 to 2014, Defendant Londell Williams, an African-American, held the director position in Ward 3. Mr. Williams was recently defeated by a Caucasian opponent in the November 2014 election.

3. Following the decennial census of 2010, the population of Texarkana, Arkansas, was determined to be 29,938. The total African-American population was determined to be 9,948—33% of the total city population.[2]

---

[2] While the population has been stated as 29,922 in some pleadings, the Court arrived at 29,938 by adding up the six individual ward populations set out in the "Mike Jones Map" (Defendants' Exh. 7) and Plaintiff's proposed map (Defendants' Exh. 12). The Court also arrived at the total African-American population from these maps.

4. Based on the population shifts reflected in the census, it was clear that ward boundary lines would have to be redrawn. The Board of Directors determined that a target population for each ward should be arrived at by dividing the total population by six and allowing a variance of plus or minus 5%. Using these criteria, a target population for each of the six wards was 4,989 with a variance of 249.

5. If there had been no redistricting after the 2010 census, the population in Ward 2 would have been below the 5% variance by 51 people, and the population in Ward 3 would have been below the 5% variance by 376 people. The voting age population in Ward 2 would have been 50.83% African-American, and the voting age population in Ward 3 would have been 47.19% Africa-American. (Defendants' Exh. 3).[3]

6. The Election Commission and Board of Directors agreed to utilize the services of Texarkana Water Utilities ("TWU") for Geographic Information System ("GIS") mapping and census data accumulation. With the assistance of TWU, every director was given the opportunity to draw a proposed ward map. The directors were advised to follow two guidelines when preparing their maps: (1) stay within the 5% variance and (2) draw two "majority-minority" wards (i.e., wards with a total population greater than 50% African-American).

7. Many directors worked with TWU on proposed maps. Eleven maps were prepared at the direction of Plaintiff. (Defendants' Exhs. 4-5, 8-14, 16-17). On November 7, 2011, the Board of Directors held a meeting where the directors were given the opportunity to formally submit their proposed maps. Four maps were discussed at the meeting: (1) a map prepared by

---

[3] Ward 1 would have been below the 5% variance by 111 people. Ward 4 would have been below the 5% variance by 30 people. Ward 5 would have been above the 5% variance by 524 people. Ward 6 would have been above the 5% variance by 553 people. (Defendants' Exh. 3).

Director Mike Jones; (2) a map prepared by Director Londell Williams;[4] (3) a map prepared by Plaintiff Laney Harris; and (4) a map prepared by TWU.[5]  At the conclusion of the meeting, the Board of Directors voted 5-2 in favor of the Mike Jones map.  Plaintiff and Director Ruth Davis accounted for the two votes against the Mike Jones map.[6]

8. On November 15, 2011, the Board of Directors submitted the Mike Jones map to the Election Commission for approval.  Despite his dissatisfaction with the Mike Jones map, Plaintiff did not submit a different map to the Election Commission for approval.  After reviewing the Mike Jones map, the Election Commission was satisfied with the new lines and the map was adopted.

9. At the November 15 Election Commission meeting, Plaintiff raised concerns about the Board of Directors' involvement in drawing ward boundary lines.  Plaintiff pointed out that, pursuant to Ark. Code. Ann. § 14-61-109, it was the Election Commission's responsibility to redraw ward lines, not the Board of Directors'.[7]  After reviewing the statute for what appears to have been the first time, the Election Commission determined that the process they followed— allowing the Board of Directors to submit a proposed map for final approval by the Election

---

[4] Williams withdrew his map from consideration before the vote took place.  Williams ultimately voted in favor of the Mike Jones map.

[5] The map prepared by TWU was first presented to the Board of Directors at an earlier meeting.  The Directors' lack of consensus on the acceptability of this map when it was presented resulted in the Directors working with TWU on their own proposals that were presented at the November 7 meeting.

[6] Plaintiff and Director Davis voted in favor of the TWU map.

[7] The 2011 version of the statute provided that "[t]he county board of election commissioners of the county shall divide the territory of the city into the number of wards having substantially equal population[.]" Ark. Code Ann. § 14-61-109 (amended 2013). The statute has been revised since 2011. Under the revised statute, it is the city's governing body (i.e. the Board of Directors) that is responsible for drawing ward boundary lines: "(1) The governing body shall divide the territory of the city into the number of wards having substantially equal population, according to the most recently published federal census of population in the city, equal to the number of members of the governing body to be elected from wards[.]" Ark. Code Ann. § 14-61-109 (2013).

Commission—was permissible under the statute. Nonetheless, now that the Election Commission was equipped with a better understanding of their role and responsibility in the line-drawing process, they opted to take a second look at the proposed Mike Jones map and re-vote. The Election Commission held this second vote on November 17, 2011, and after further consideration, the Mike Jones map was once again adopted. (Defendants' Exhs. 1-2).

10. The Mike Jones map is within the 5% total population variance for all wards. The voting age population for Ward 2 is 48.78% African-American, 4.34% other, and 46.88% Caucasian. The voting age population for Ward 3 is 49.44% African-American, 3.16% other, and 47.40% Caucasian. (Defendants' Exh. 7).[8]

11. At trial, Plaintiff submitted a map for the Court's review and proposed it as an alternative to the Mike Jones map. (Defendants' Exh. 12). Under Plaintiff's proposal, the population for Ward 2 would be within the 5% total population variance. The Ward 2 voting age population would be 50.00% African-American, 3.88% other, and 46.12% Caucasian. The total population for Ward 3 would be below the 5% variance by 20 people. The Ward 3 voting age population would be 51.37% African-American, 3.69% other, and 44.94% Caucasian.[9]

## CONCLUSIONS OF LAW

*1. Voting Rights Act*

Plaintiff claims that the adoption and implementation of the Mike Jones map violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. Specifically, Plaintiff alleges that the current boundary lines dilute the minority voting power of African-American residents within Wards 2 and 3. The primary source of Plaintiff's dilution argument is a previous Voting Rights

---

[8] Under the adopted Mike Jones map, the total population in Ward 2 is 51.4% African-American. The total population in Ward 3 is 53.62% African-American.

[9] Under Plaintiff's proposed map, the total population in Ward 2 is 52.93% African-American. The total population in Ward 3 is 55.34% African-American.

Act case involving the City of Texarkana, *Williams v. City of Texarkana, Arkansas*, 861 F. Supp. 756 (W.D. Ark. 1992). Plaintiff argues that the *Williams* case requires the City of Texarkana to maintain two wards with majority-minority voting age populations. Because the Mike Jones map reflects Africa-American voting age populations of 48.78% and 49.44% in Wards 2 and 3, Plaintiff argues that the map runs afoul of the holding in *Williams*. As the Court will explain below, this is an improper reading of the *Williams* opinion. After discussing the import of the *Williams* opinion, the Court will go on to discuss whether Plaintiff has met the threshold requirements for sustaining a Voting Rights Act claim.

In 1992, a federal lawsuit was filed against the City of Texarkana and others alleging violations of §2 of the Voting Rights Act. At the time the case was filed, three of the seven seats on the City of Texarkana Board of Directors were elected on an at-large basis. The four remaining board members were elected from wards. The suit alleged that "the at-large method of electing city directors effectively dilutes the voting power of African–Americans in Texarkana and excludes them from meaningful participation in the election of city directors." *Williams v. City of Texarkana, Arkansas*, 861 F. Supp. 756, 757 (W.D. Ark. 1992). The Plaintiffs asked the Court to "enjoin the defendants from conducting any further at-large elections and to require the establishment of seven (7) single-member districts from which city directors will be elected." *Id*. Upon consideration, the Court found that the at-large voting system had resulted in a Voting Rights Act violation:

> Based upon the evidence offered by the parties, the Court finds there is racially polarized voting in the city of Texarkana city board elections; that black voters in the city usually vote cohesively in a bloc or as a unit; and that white voters have the strength and inclination under the present 4–3 system to frustrate the choices of black voters with respect to all three at large positions and with respect to three of the four ward positions. Thus, pursuant to the precepts of *Gingles,* the court finds that the present four-three structure for the election of the city board of Texarkana deprives black

> citizens of the city of an equal opportunity to participate in the political process and to elect candidates of their choice.

*Id*. at 765. The Court dissolved the four-three structure for electing directors and directed the parties to submit proposals for remedying the Voting Rights Act violation. In 1993, the Court decided on the proposals submitted by the parties. *Williams v. City of Texarkana, Ark.*, 861 F. Supp. 771 (W.D. Ark. 1993) *aff'd*, 32 F.3d 1265 (8th Cir. 1994). The Court adopted the plaintiffs' proposal which provided for a seven director single district plan with no at-large positions. *Id*. at 772. The Court noted that, "[t]wo (2) of the seven (7) districts proposed in plaintiffs' plan would feature minority populations of 60.5% and 60.1% respectively, and a third district would have a minority population of 45.8%." It appears that these numbers were based on total population rather than voting age population.

Aside from acknowledging the numbers in Plaintiffs' proposal, the Court made no pronouncements about the required racial makeup of the seven wards or how boundary lines were to be drawn. In fact, in its 1992 order, the Court specifically declined to address issues of ward boundaries and ward populations. In declining to address those issues, the Court noted that "[t]he real problem addressed by plaintiffs in this suit and the proper basis for their success is the effect of the three at-large seats in the 4–3 scheme." *Williams*, 861 F. Supp. 756, 766.

The Court in *Williams* was careful to adopt a plan that provided for African-American voting representation that correlated with the African-American population in Texarkana. However, nothing in the Court's order suggests that the ward populations in the adopted proposal must remain in force even in the face of population shifts or changes to the city government structure. Moreover, the Court explicitly acknowledged that the plan it adopted had the potential to be revised:

> [T]he Texarkana electorate has not yet spoken and it is possible that, at some time in the future, the voters of Texarkana may wish to change their structure of city government—a right which is theirs under state law. This Court will not make any presumption that the citizens of Texarkana would choose a plan violative of the Voting Rights Act should they see fit to address the matter in the future.

*Williams*, 861 F. Supp. 771, 772.[10]

In sum, while the *Williams* case is instructive and historically relevant to the case that is currently before the Court, it does not contain a *per se* rule requiring that two wards in Texarkana have a set percentage of African-Americans, either in total population or voting age population. Plaintiff may not prevail on his Voting Rights Act claim simply because the current ward demographics deviate from the ward demographics in the *Williams* case. He must establish that there has been a new violation based on current demographics and recent actions within the city government.

Before addressing the substance of Plaintiff's allegations, the Court will review the relevant portions of the Voting Rights Act. Section 2 reads as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the

---

[10] Subsequent to the 1993 *Williams* order, the voters of Texarkana did, in fact, approve a change to the city government structure. The voters approved a "6-1 plan" by which six directors would be elected from wards and one director, the mayor, would be elected at large. *Jewell v. Miller Cnty. Election Comm'n*, 327 Ark. 153, 154, 936 S.W.2d 754, 754 (Ark. 1997). This structure is still in place today. At trial, Plaintiff Laney Harris did not argue that the current 6-1 system is in violation of the Voter Rights Act. Plaintiff's arguments focused exclusively on how the boundary lines of the six wards should be drawn.

> electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301.  In a vote dilution claim like the one in this case, § 10301(b) is violated when it is proven that "the voting strength of a politically cohesive minority is diluted by either (1) fragmenting minority voters among several districts so that a majority bloc can usually outvote the minority, or…(2) packing the minority into one or several districts so that the minority's influence is minimized in its neighboring districts." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (citing *Voinovich v. Quilter*, 507 U.S. 146, 154, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993)).  In this case, Plaintiff alleges that the minority vote is being fragmented among several wards.

Before the Court can consider the totality of the circumstances surrounding Plaintiffs' fragmentation allegations, Plaintiff must first prove by a preponderance of the evidence three elements referred to as the "*Gingles* preconditions":

> (1) [T]he racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

*League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 425, 126 S. Ct. 2594, 2614, 165 L. Ed. 2d 609 (2006) (internal citations and modifications omitted). "Failure to prove each of the preconditions defeats a Section 2 claim.  If the three preconditions are met, the court proceeds to consider the totality of the circumstances." *Hazeltine*, 461 F.3d at 1018 (internal citations omitted).

In essence, the first *Gingles* precondition requires a plaintiff to demonstrate that there is an effective and feasible remedy for the alleged vote dilution. A plaintiff must submit an alternative plan—in this case, a boundary map—that shows "by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett v. Strickland*, 556 U.S. 1, 19-20, 129 S. Ct. 1231, 1246, 173 L. Ed. 2d 173 (2009). This requirement relies on an objective, numerical test: Do African-Americans "make up more than 50 percent of the voting-age population in the relevant geographic area?" *Id*. at 18.

The relevant geographic area in this case is Wards 2 and 3. Under the Mike Jones map which adheres to the 5% plus or minus population variance, the African-American voting age populations in Wards 2 and 3 are 48.78% and 49.44%, respectively. Under Plaintiff's proposed map, which does not adhere to the 5% plus or minus population variance, the African-American voting age populations in Wards 2 and 3 would be 50.00% African-American and 51.37%, respectively. Accordingly, under Plaintiff's map, only Ward 3 would have a majority-minority voting age population.

Under these circumstances, the Court finds that Plaintiff has not satisfied the first *Gingles* precondition. Plaintiff has consistently argued that *two* wards in Texarkana can be and must be drawn to reflect a majority-minority voting population, yet, after many attempts to draw such a map, he has been unable to accomplish this configuration. Because there has been no evidence submitted to the Court to show that drawing two majority-minority wards is feasible, Plaintiff's Voting Rights Act claims fails.

While the Court's inquiry could end at the first *Gingles* precondition, it should be noted that Plaintiff has also failed to satisfy the third *Gingles* precondition—that there is a white majority in the geographically relevant area that votes sufficiently as a bloc to enable it usually to

defeat the minority's preferred candidate.[11] Under the Mike Jones map, the white voting age populations in Wards 2 and 3 are 46.88% and 47.40%, respectively.[12] "Other" races account for 4.34% of the voting age population in Ward 2 and 3.16% of the voting age population in Ward 3. Plaintiff has offered no evidence or argument to show that white voters in Wards 2 and 3 vote in a bloc with voters classified as "other" races. *See Meek v. Metro. Dade Cnty.*, 908 F.2d 1540, 1545-46 (11th Cir. 1990) (holding that a "coalition of Hispanics and Non Latin Whites could form the relevant majority voting bloc for the purpose of the third *Gingles* factor.") Accordingly, Plaintiff has failed to show that there is a white majority voting bloc in Wards 2 and 3.[13]

Even if Plaintiff had satisfied the three *Gingles* preconditions, his claim would fail under the next phase of the analysis, the totality of the circumstances test. After satisfying the *Gingles* preconditions, a plaintiff must "prove that the totality of the circumstances indicates minority voters had 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice[.]'" *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1021 (8th Cir. 2006) (quoting 52 U.S.C.A. § 10301(b)). In considering the totality of the circumstances, the Court is to consider the following factors:

> (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political

---

[11] As to the second *Gingles* precondition, there was minimal evidence submitted by Plaintiff on this point. However, the Court will assume without deciding that African Americans in the relevant geographic area are politically cohesive.

[12] In both wards, the African-American voting age populations are 2% *higher* than the white voting age populations.

[13] To be clear, the Court is not suggesting that white voters do not constitute a voting bloc in Wards 2 and 3. The relevant question is whether the voting blocs constitute a majority. In this case, they do not.

> subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Id.* (citing S.R. No. 97–417 at 28–29 (1982); *Gingles*, 478 U.S. at 44–45, 106 S.Ct. 2752). "Two factors predominate the totality-of-circumstances analysis: 'the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme.'" *Id*. at 1022 (quoting *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995)).

In this case, there was little evidence offered on the factors listed above. Relevant issues that did come up included the map-drawing and selection process and the electoral history of African-Americans in Wards 2 and 3. Weighing all the evidence submitted at trial, the Court finds that the totality of the circumstances does not evidence a Voting Rights Act violation.

First, it is clear that the map drawing that was embarked upon after the 2010 census was a transparent process with no attempts to dilute the African-American vote. The Court viewed video of an hour-long Board of Director's redistricting meeting (Plaintiff's Exh. 7) where the different map proposals were presented. Each proposal showed an attempt to draw two majority-minority wards while maintaining a 5% ward population variance. There is no evidence to suggest that there was any concerted effort to remove African-American voters from Wards 2 and 3, and no one at the meeting, including Plaintiff, raised any concerns about African-American vote dilution at the time.

Second, the electoral history of Wards 2 and 3 shows that African-Americans have won all but one election in recent history. Plaintiff was first elected in Ward 2 in 1996. Prior to Plaintiff being elected, an African-American held the Ward 2 director position. Plaintiff held his seat until 2004 when he was defeated by an African-American opponent. Plaintiff reclaimed his seat in 2008 and ran unopposed in 2012. The Mike Jones map was in force during the 2012 election. From 1978 to 2014, Defendant Londell Williams, an African-American, held the director position in Ward 3. Mr. Williams was defeated by a white opponent in the November 2014 election. There was testimony that Williams was defeated by roughly thirty-five votes. The Court finds that one loss by an African-American candidate is not sufficient to establish that the Mike Jones map has impermissibly diluted the African-American vote in Wards 2 and 3.

In sum, Plaintiff has failed to show that the City of Texarkana's current ward map has violated the Voting Rights Act. There was not an overt attempt made by the Board of Directors or Election Commission to dilute the African-American vote in Wards 2 and 3, nor have their actions resulted in impermissible dilution. The voting age populations of African-Americans in Wards 2 and 3 outnumber the white voting age populations by roughly 2% in each ward. Given these statistics and the electoral history of these wards, Plaintiff has not shown that African-Americans have been unable to participate in the political process and to elect representatives of their choice. Accordingly, Plaintiff's Voting Right Act claims fails.

*2. First and Fourteenth Amendment Claims*

While Plaintiff's Amended Complaint and evidence at trial focused almost exclusively on his Voting Rights Act claim, he briefly alleges in his Amended Complaint that the Texarkana redistricting amounts to "gerrmandering [sic] in violation of the Equal Protection Clause of the 14th Amendment[.]" (ECF No. 3, ¶ 42).

Section 1983 provides a cause of action for constitutional violations committed under color of state law. 42 U.S.C. § 1983. To prevail, plaintiffs must demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law. *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004). To establish a violation of the Equal Protection Clause of the Fourteenth Amendment, Plaintiff must show that the Defendants' decision or act had a discriminatory purpose and effect. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 241–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

As previously discussed, the Court finds no evidence of a discriminatory purpose by the City of Texarkana, the Board of Directors, or the Election Commission in drawing the ward boundary lines. The map drawing process was transparent, and the evidence shows that there were genuine efforts made to ensure that all wards had substantially equal populations while maintaining two wards with a majority-minority population. Accordingly, Plaintiff's Fourteenth Amendment claim fails.

Plaintiff also briefly alleges that the Texarkana redistricting violates the Establishment Clause of the First Amendment because there was a request by a Director to keep a specific church within his ward. Plaintiff argues that "[t]here is not any law or provision that a ward redistricting boundaries can be base [sic] any building, not even such as a church." (ECF No. 3, ¶ 43). The Court is at a loss to find a coherent framework for analyzing Plaintiff's First Amendment allegations, and Plaintiff has offered no legal authority on the subject. Assuming

that Plaintiff is claiming that the City of Texarkana endorsed a certain religion by considering whether a church fell within a certain ward boundary, his claim is unsustainable.

The Establishment Clause of the First Amendment guards against "governmental practice [that] either has the purpose or effect of 'endorsing' religion[.]" *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). In this case, there was no endorsement of any religion by the City of Texarkana, the Board or Directors, or the Election Commission. The alleged consideration of where the church fell within the ward boundaries was not an attempt to make religion relevant to a citizen's standing within the community, and there is no evidence that the religion practiced by the members was a consideration. *See Id*. at 3117. The church was only relevant insofar as it had members who were of voting age who had a relationship with a member of the Board of Directors. Accordingly, Plaintiff's First Amendment claims fails.

## CONCLUSION

Based upon the above findings of fact and conclusions of law, the Court finds that Defendants are entitled to judgment in their favor and against Plaintiff Laney Harris. A judgment of even date consistent with this opinion shall issue.

**IT IS SO ORDERED**, this 9th day of January, 2015.

    /s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

15